## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| MONTEREY CONSULTANTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20-1663 |
| | ) | |
| THE UNITED STATES, | ) | Filed: April 29, 2022 |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This case arises from a contract between Plaintiff, Monterey Consultants, Inc., ("Monterey") and the United States, acting by and through the Department of Veterans Affairs ("VA") and the VA's Center for Verification and Evaluation ("CVE"), to process and verify applications for the CVE's Veterans First Contracting Program. Monterey claims that it suffered financial losses performing the contract due to an inaccurate pricing specification as well as the VA's constructive change to the contract. It seeks declaratory judgment and monetary relief from the Government pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101–7109.

Before the Court is the Government's Motion to Dismiss under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") for failure to state a claim upon which relief may be granted. For the reasons discussed below, Monterey's Complaint states facts sufficient to survive the Government's Motion. Consequently, the Motion is **DENIED**.

## I.  BACKGROUND

### A.    Statutory and Regulatory Background

The CDA requires a contractor with a contract dispute against the federal government to submit each claim "to the contracting officer [("CO")] for a decision" before bringing an action in

the Court of Federal Claims.  41 U.S.C. § 7103(a)(1); *see id.* § 7104(b)(1).  It further requires "that the claim be in writing and that the contractor certify claims over $100,000." *Northrop Grumman Computing Sys. v. United States*, 709 F.3d 1107, 1111 (Fed. Cir. 2013) (citing 41 U.S.C. §§ 7103(a)–(b)).  Whether a contractor has submitted a valid claim is determined in accord with the Federal Acquisition Regulation ("FAR").  *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995)).  Because a "claim" is not defined by the CDA, the Court looks to the definition supplied by the FAR.  *Id.*  The FAR defines a claim as: "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract."  48 C.F.R. § 2.101; *see id.* § 52.233-1(c).

"While a CDA claim need not be submitted in any particular form or use any particular wording," the United States Court of Appeals for the Federal Circuit has held that "it must contain 'a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.'"  *Maropakis Carpentry*, 609 F.3d at 1327 (quoting *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1997)); *see Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003).  Further, for monetary claims under the CDA, a contractor must include a "sum certain."  *Securiforce Int'l Am., LLC v. United States*, 879 F.3d 1354, 1359–60 (Fed. Cir. 2018).

After the CO issues his or her decision on the claim, the contractor may "bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary." 41 U.S.C. § 7104(b)(1).  The contractor must file any such action within 12 months from the date it receives the CO's decision.  *Id.* § 7104(b)(3).

2

CDA claims are reviewed de novo by the Court.  *Id.* § 7104(b)(4); *see Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562 (Fed. Cir. 1990).

### B.    Factual Background

The VA awarded Monterey a contract under Solicitation No. 36C10X18R0141 ("Solicitation") on August 29, 2018.  Compl. ¶ 41, ECF No. 1; *see* App. to Def.'s Mot. to Dismiss at 4–81, ECF No. 11-1 (Contract No. 36C10X18D0046).  Pursuant to the contract, the VA on-ramped Monterey into an existing project where Monterey processed applications from businesses who sought certification as Veteran-Owned, or Service-Disabled Veteran-Owned, Small Businesses.  ECF No. 1 ¶ 21.  Such verification permits businesses to compete for certain VA procurements set aside specifically for veteran-owned entities.  *Id.* ¶ 2; *see* 38 U.S.C. § 8127.

The contract required Monterey to perform verification work in compliance with VA-issued "Work Instructions" that established the particular methods and scripts Monterey followed in processing applications and documented on the CVE's Case Tracking Form ("CTF").  ECF No. 1 ¶ 62; *see* ECF No. 11-1 at 16, 18.  The contract permitted the VA to update the Work Instructions throughout the contract period.  Changes that reflected only "minor process updates/changes (yet [did] not constitute significant adjustments to current process instructions) [did] not require a contract modification."   ECF No. 1 ¶ 65; *see* ECF No. 11-1 at 16.

Because not every application to the CVE would take the same amount of time for Monterey to process—due to some applicants dropping out of the verification process at different stages—Monterey's compensation under the contract was determined by a "Case Equivalent" ("CE") ratio.  ECF No. 1 ¶ 30.  This ratio signified "the level of effort derived from the amount of time" Monterey spent performing required activities on an application.  *Id.* ¶ 29.  For example, the VA assigned a CE of 0.1 to applications withdrawn after receiving only a "welcome call" from

Monterey, whereas an application that progressed all the way to Monterey's making an initial eligibility determination was given a full CE of 1.0. *Id*. ¶ 30.

According to Monterey, to determine its CE "unit price" under the contract, the Solicitation required Monterey to propose labor hours and rates it deemed necessary to process 900 cases and then divide that number by 650 case equivalents. *Id*. ¶ 32. Monterey asserts that it "had no ability or option to use a different ratio or methodology to establish a Case Equivalent 'unit price' from the total level-of-effort price it had proposed to process 900 cases." *Id.* As a result, Monterey's unit price for a CE came out to $1,560.98. *Id*. ¶ 42. Monterey's proposal in response to the Solicitation included a CE unit price of $1,555.18, "representing a very slight discount from the $1,560.98 ceiling 'unit price' established at the Contract level by the VA's mandated 650/900 Case-Equivalent-to-total-cases ratio." *Id.* ¶ 44. Under the contract, this discounted unit price was the total amount the VA would compensate Monterey for each CE realized. *Id.*

Monterey claims that, as it performed under the contract, it became aware "that the applications the VA had issued to Monterey for processing, through no fault of Monterey, were not resulting in the 650/900 Case Equivalent-to-total-cases ratio the VA had specified in the On-Ramp Solicitation as the basis for establishing the Case Equivalent 'unit price.'" *Id.* ¶ 46. Simply put, Monterey was not getting the amount of work it had anticipated under the contract based on the CE ratio, as CVE applicants did not stay in the verification process long enough to generate the 650/900 CEs that Monterey anticipated. *See id.* Monterey alleges the VA's CE ratio, for purposes of determining the CE unit price, "was materially understated in relation to the actual level of effort Monterey had priced as necessary to process 900 cases per month." *Id*. ¶ 57. In other words, had the VA accurately determined the Case Equivalent-to-total-cases ratio,

Monterey's unit price "would have been nearly *double* the amount actually established in the Contract." *Id.* (emphasis in original).  As such, Monterey says it has suffered damages.  *Id.* ¶ 61.

Monterey further alleges that after the VA awarded the contract it issued multiple revisions to the Work Instructions that resulted in a constructive change to the contract.  *Id.* ¶ 73. In all, the Government updated the Work Instructions six times after Monterey submitted its original proposal.  *Id.* ¶ 110; *see* ECF No. 11-1 at 300.  Monterey argues that these changes were more than "minor" and required Monterey to devote approximately eight additional, unanticipated hours of labor to achieve a CE, which caused further financial harm.  ECF No. 1 ¶ 73.

### C.    Procedural Background

#### 1.    Monterey's First Certified Claim

On March 29, 2019, Monterey submitted a certified claim to the CO, requesting "an equitable adjustment and forthcoming invoice to recover financial losses of $1,453,840.34 [as of February 28, 2019] due to the misrepresentation of the monthly workload and case equivalents (CEs), undervalued multipliers, and unavailable multipliers in VEMS [the Veterans Enterprise Management System], and a contract modification to account for the CTF changes that . . . created additional work for Monterey personnel in completing verification tasks."  ECF No. 11-1 at 190 (Monterey's First Certified Claim).  Monterey alleged that the VA failed in its duty of good faith and fair dealing through its "lack of due diligence in establishing accurate monthly productivity estimates in the solicitation."  *Id.*; *see* ECF No. 1 ¶ 47.  Monterey's claim specifically related to costs incurred while processing applications from October 9, 2018, to February 28, 2019.  ECF No. 1 ¶ 47.

It further sought contract modification to adjust the CE ratio due to what Monterey alleged were "significant revisions to the CTF."  ECF No. 11-1 at 190.  It claimed that "the Government

did not act in good faith when it increased the amount of work required by our personnel in the significant revisions to the CTF without input from Monterey concerning the impacts of those changes or a corresponding contract modification incorporating those changes." *Id.* Monterey specifically noted that their requested remedy for this portion of the claim was "not monetized nor part of the $1,453,840.34 total claim." *Id.*

The CO denied Monterey's first certified claim on August 7, 2019. ECF No. 1 ¶ 48; *see* ECF No. 11-1 at 262–74 (VA's 2019 Final Decision). It disagreed with Monterey's assertion that the VA's preparation of the estimated monthly workload in the CE ratio fell short of the Government's duty of good faith and fair dealing. ECF No. 11-1 at 264. The CO pointed out that Monterey was operating under an Indefinite Delivery/Indefinite Quantity ("IDIQ") contract and that "courts have foreclosed contractors' recovery for negligently prepared estimates in IDIQ contracts." *Id.* (citing *Dot Sys., Inc. v. United States*, 231 Ct. Cl. 765, 769 (1982)); ECF No. 1 ¶ 48. The CO held that the VA met its obligations under the IDIQ contact at issue because the VA was required to purchase only "the minimum guaranteed amount specified in the contract," which it had done. ECF No. 11-1 at 265; ECF No. 1 ¶ 48. The CO further stated that although the VA "was not required to provide historical workload or related data in the solicitation, the [caseload] estimate[] provided in the solicitation was based on historical data," and he went on to describe the same. ECF No. 11-1 at 266; *see id.* at 266–269 (describing the historical data from 2015–2016 used to develop the 900 cases per month caseload estimate); *see also* ECF No. 1 ¶ 50. He also summarized the results of a one-month test trial completed in 2016 that the VA used to develop the 650 case-equivalents-per-month estimate. ECF No. 11-1 at 267; *see* ECF No. ¶ 51.

Finally, the CO held that the changes to the CTF were "'minor' in nature; therefore, an equitable adjustment through a contract modification [was] not warranted." ECF No. 11-1 at 272

(noting that "Monterey should have brought any changes it believed to be beyond 'minor' to the attention of the CO as soon as it became aware of a potential change in the contract"); *see* ECF No. 1 ¶ 83.

Monterey did not appeal the CO's decision or bring an action in this court. Instead, it completed its performance under the contract "on or about November 25, 2019." ECF No. 1 ¶ 69.

2. Monterey's Second Certified Claim

On March 4, 2020, Monterey submitted a second certified claim to the CO seeking compensation totaling $2,164,192.01. *Id.* ¶ 70; *see* ECF No. 11-1 at 281–313 (Monterey's Second Certified Claim). In its March 2020 certified claim letter, Monterey specified that, "[n]otwithstanding the 2019 Claim, this Claim constitutes a new and separate claim, because the grounds for the 2019 Claim were materially different from the grounds for the current Claim." ECF No. 11-1 at 287. Monterey again alleged that the flawed 650/900 CE ratio caused Monterey financial harm under the contract; however, this time it alleged that the "VA breached the implied duty of good faith and fair dealing by failing to disclose in the May 2018 Solicitation the VA's superior knowledge (i) that no contractor had realized a 72% [650/900] Case Equivalent ratio processing verification applications, and (ii) that the 650 to 900 Case Equivalent ratio was not based on any actual performance, despite the fact that the VA had actual data of contractor performance of this exact requirement." *Id.* at 287–88; *see* ECF No. 1 ¶ 101. According to Monterey, the 650/900 CE ratio "amount[ed] to a defective government price specification." ECF No. 11-1 at 288.

Monterey asserted that it discovered the CE ratio was materially misrepresented only after the CO issued its final decision on Monterey's earlier March 2019 claim, discussing the historical data and one-month test trial on which the VA based the ratio. ECF No. 1 ¶ 52; s*ee* ECF No. 11-

1 at 289.  Monterey argued that the VA should have disclosed during the solicitation process the data it had amassed between 2016 and 2018 about the actual performance of other contractors doing the same CVE processing work.  ECF No. 11-1 at 290; *see* ECF No. 1 ¶ 87.  According to Monterey, "[t]hat more recent information available to the VA at the time it issued the Solicitation confirmed that the contractors processing verification applications were not experiencing anywhere close to a 72% [650/900] Case Equivalent ratio."  ECF No. 11-1 at 290; *see* ECF No. 1 ¶ 97.  Accordingly, Monterey alleged that the VA had actual, superior knowledge regarding the CE ratio, about which Monterey had no reason to know, and that it failed to disclose that information, all of which misled Monterey in bidding on the contract.  ECF No. 11-1 at 291–92; *see* ECF No. 1 ¶87.  Monterey requested damages in the amount of $1,211,911.86 in additional compensation due to the defective CE unit price specification, as well as an adjustment of the unit price from $1,560.98 to $2,434.40.  ECF No 11-1 at 312; *see* ECF No. 1 ¶ 75.

Monterey also claimed that VA's "numerous" changes to the Work Instructions amounted to a constructive change for which Monterey was entitled to damages.  ECF No. 11-1 at 299; *see* ECF No. 1 ¶ 73.  Monterey explained that under the contract it was obligated to comply with the Work Instructions and that the VA could update those instructions without modifying the contract only to "reflect minor process updates/changes."  ECF No 11-1 at 300; *see* ECF No 1 ¶ 73.  According to Monterey, "[t]he VA updated the Work Instructions six times after Monterey submitted its June 15, 2018 price proposal that established the Case Equivalent ceiling price in the Contract (which, in turn, limited the Case Equivalent price Monterey proposed for the Task Order)."  ECF No 11-1 at 300; *see* ECF No. 1 ¶ 110.  It claimed that three of those revisions (Work Instructions Versions 6, 8, and 10—issued between August 2 and December 10, 2018) "added new tasks or increased the performance requirements for existing tasks in ways that materially

8

increased the level of effort associated with processing case applications." ECF No. 11-1 at 300. Monterey sought $952,280.15 for the additional work it performed beyond the scope of the contract. *Id.* at 312; *see* ECF No. 1 ¶ 74.

On September 17, 2020, the CO issued a decision on Monterey's second certified claim. *See* ECF No. 11-1 at 315–27 (VA's 2020 Final Decision); ECF No. 1 ¶ 79 (indicating that the same was sent to Monterey the next day). He disagreed that Monterey's 2020 claim regarding the CE unit price was distinct from its 2019 claim. ECF No 11-1 at 318; *see* ECF No. 1 ¶ 81. The CO held that Monterey's 2020 arguments merely "buil[t] on" or provided "different legal dressing" for its prior allegations challenging the accuracy of the 650/900 CE ratio. ECF No 11-1 at 320. In the CO's opinion, the 2019 decision articulated the VA's position that the ratio was developed in good faith and was accurate as shown by the historical caseload data and results of the case processing trial test. *Id.* As such, the CO determined that the VA had "fully addressed these issues in its final decision of August 6, 2019." *Id.* at 326. However, the CO determined that Monterey's constructive change claim presented "a separate and distinct claim" because it challenged "changes to the work instruction as opposed to the [CTF]" and requested a "different remedy . . . to resolve the issue." *Id.* at 321. The CO thus provided a final decision on that claim, finding that Monterey was entitled to $95,876.60 in compensation (about 10% of the total claimed damages) for the constructive change made to the Work Instructions. *Id.* at 326; *see* ECF No. 1 ¶ 83.

      3.    <u>The Instant Action</u>

Monterey filed suit in this Court on November 23, 2020, asserting four claims: (1) breach of implied duty to disclose superior knowledge, (2) breach of implied warranty that specifications are free from errors, (3) misrepresentation of material fact in contract, and (4) constructive change.

*See generally* ECF No. 1.  The Government filed its Motion to Dismiss on April 30, 2021.  *See* Def.'s Mot. to Dismiss, ECF No. 11; *see also* Def.'s Reply, ECF No. 15.

The Government contends that the issues raised in Monterey's second certified claim, which form the basis of Monterey's four-count Complaint, were also a part of Monterey's first certified claim.  Specifically, both premised their allegations on faults with the CE ratio and both alleged that Monterey had to do additional work because of revisions to the contract's Work Instructions.  ECF No. 11 at 18–19.  Accordingly, the Government argues that Monterey should have brought those issues before the Court within a year of the CO's 2019 decision on the first certified claim.  *Id.* at 17.  Because Monterey failed to do so, the Government argues that Monterey's Complaint is untimely and must be dismissed.  *Id.* at 19.  Further, it also submits that the Court should dismiss Monterey's fourth count on independent grounds because Monterey's Complaint failed to adequately plead the elements of a constructive change claim.  *Id.* at 23.  According to the Government, the changes to the Work Instructions cannot be the basis of such a claim because the contract anticipated and required Monterey's compliance with updates to the Work Instructions.  *Id.*  Further, the Government argues Monterey did not adequately allege that the additional work resulting from the changes was done at the Government's direction.  *Id.* at 25.

In response, Monterey contends its 2019 and 2020 certified claims are factually and legally distinct.  *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 21, ECF No. 13.  It argues that—although both take issue with the accuracy of the 650/900 CE ratio—the first claim asserted that the quantity of CEs was lower than anticipated, whereas the second claim argues that the unit price Monterey was paid for CEs was "materially understated."  *Id.*  Further, Monterey argues that its first certified claim took issue expressly with changes to the CTF—rather than the Work Instructions—and did not seek a sum certain for that issue.  *Id.* at 36.  It also asserts that its Complaint adequately alleges

that the changes made to the Work Instructions were not minor process changes and collectively amounted to a constructive change to the contract. *Id.* at 18, 40 (noting that the CO held the same in its 2020 decision). Monterey further disputes that it failed to adequately plead that the additional work performed under the revised Work Instructions was at the direction of individuals with the authority to bind the VA. *Id.* at 43.

## II.  STANDARD OF REVIEW

A motion to dismiss for failure to state a claim upon which relief may be granted "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). To survive the motion, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009). A "plausible" complaint "does not need detailed factual allegations," but it must state enough detail "to raise a right of relief" beyond mere speculation. *Twombly*, 550 U.S. at 555.

When reviewing a motion under RCFC 12(b)(6), the Court considers all allegations in the complaint and may also consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)); *see Terry v. United States*, 103 Fed. Cl. 645, 652 (2012) ("documents appended to a motion to dismiss 'are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim'") (quoting *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)). The Court "assume[s] all well-pled factual allegations are true" and makes "all reasonable inferences in favor of the

nonmovant." *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006).

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice" to shield a complaint from dismissal. *Iqbal*, 556 U.S. at 678. The

Court is likewise "not bound to accept as true a legal conclusion couched as a factual allegation."

*Acceptance Ins. Co. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (internal citations

omitted).

## III. DISCUSSION

Assuming the truth of its allegations and accepting all reasonable inferences in its favor,

Monterey has pled sufficient facts to state a plausible claim for relief. Monterey's 2020 certified

claim is sufficiently distinct from its 2019 certified claim; therefore, Monterey did not fail to bring

its cause of action within the 12-month window mandated by 41 U.S.C. § 7104(b)(3). Further,

Monterey's constructive change claim related to the Work Instructions does not fail to state a

plausible claim for relief, as the Complaint sufficiently alleges that the changes at issue were

outside the scope of the contract and that the VA ordered Monterey to perform the additional work

resulting from the changes.[1]

### A.    Monterey's 2019 and 2020 Certified Claims are Not the Same.

A contractor that wishes to dispute the decision of a CO under 41 U.S.C. § 7103 may bring

an action de novo in the Court of Federal Claims. 41 U.S.C. § 7104(b)(1). Importantly, the

---

[1] As the Government notes, there is conflicting case law about whether an action filed beyond the CDA's 12-month filing deadline should be dismissed under RCFC 12(b)(6) or RCFC 12(b)(1). *See* ECF No. 11 at 18 n.4; *compare Inter-Coastal Xpress, Inc. v. United States*, 296 F.3d 1357, 1365 (Fed. Cir. 2002) (holding that the CDA's filing deadline is jurisdictional), *with Creative Mgmt. Servs., LLC v. United States*, 989 F.3d 955, 961 (Fed. Cir. 2021) ("[W]e have questioned whether compliance with the twelve-month filing period in § 7104(b)(3) is a jurisdictional requirement."). It is not necessary for the Court to resolve this issue here because the merits of the Government's motion do not turn on the distinction between the two grounds for dismissal and, in any event, the motion is being denied.

contractor may not bring any new claims before the court that were not previously submitted to the CO. *See Scott Timber*, 333 F.3d at 1366 (The "'purpose of requiring contractors first to submit their claims to the CO' [is] to allow the CO to receive and pass judgment on the contractor's entire claim." (quoting *Croman v. United States*, 44 Fed. Cl. 796, 801–02 (1999))). Allowing new claims undermines the adjudicatory scheme of the CDA. *Cerberonics, Inc. v. United States*, 13 Cl. Ct. 415, 418 (1987) ("The critical test [of whether a claim on appeal is new] appears to be whether the scheme of adjudication prescribed by the CDA is undermined by the contractor's claim," *i.e.*, whether it "circumvent[s] the statutory role of the contracting officer.").

Two claims are distinct if they seek different remedies or "present a materially different factual or legal theory" of relief. *K-Con Bldg. Systems, Inc. v. United States*, 778 F.3d 1000, 1006 (2015) (noting that "breach of contract for not constructing a building on time versus breach of contract for constructing with the wrong materials" would present different claims); *id.* at 1006 (recognizing distinction between "the remission of liquidated damages" versus "compensation for extra work performed"). The test does not focus merely on "whether two claims have some overlapping facts." *Simulation Tech., Inc. v. United States*, 103 Fed. Cl. 105, 110 (2012). Rather, materially different claims "necessitate a focus on a different or unrelated set of operative facts." *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990).

To determine whether the claims rely on different operative facts to support materially different legal theories, the Court of Appeals has looked to the respective elements of the claims presented. *Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 777 (Fed. Cir. 2021) ("[T]he Court looks to the numerated, requisite facts that plaintiff would need to show in order to obtain the relief it sought in its two claims to determine whether they were distinct."); *see M.A. DeAtley Constr., Inc. v. United States*, 75 Fed. Cl. 575, 580 (2007). "[T]he claim before the court [in the complaint]

cannot be said to arise from the same operative facts [in the CDA claim] unless it is clear that the claim presented to the contracting officer was specific enough to give the officer notice of the basis of the claim and allow him to make an informed judgment about it." *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 52 (2021) (alteration in original) (quoting *Affiliated Constr. Grp., Inc. v. United States*, 115 Fed. Cl. 607, 612 (2014)).

Courts have typically applied this analysis in cases where the Government is seeking dismissal of purportedly new claims raised before the court or a board of contract appeals that were not first presented to the CO. *See, e.g.*, *Affiliated Constr.*, 115 Fed. Cl. at 612. Those cases are nonetheless instructive. For example, in *Lee's Ford Dock, Inc. v. Secretary of the Army*, a marina operator brought a CDA claim for reformation of contract and breach of contract against the Army Corps of Engineers after the Corps lowered the water level of the lake on which the marina was located in order to repair a nearby dam. 865 F.3d 1361, 1368 (Fed. Cir. 2017). The plaintiff submitted a claim to the CO arguing that reformation was appropriate based on *mutual mistake* and frustration of purpose. *Id.* at 1369–70 (claiming "the parties could not have envisioned at the time that they entered into the Lease that the Lake would be drawn down to such an extreme degree for such a long period of time"). In its appeal to the Armed Services Board of Contract Appeals, it argued that reformation was warranted because "the Corps misrepresented the condition of the [dam] by failing to disclose the dam's deteriorated state." *Id.* at 1370. The Court of Appeals held that the plaintiff had "predicated its reformation claim to the Board on a different set of operative facts from those presented to the contracting officer," *id.* at 1369, because the first claim to the CO "did not allege that the Corps had *knowingly misrepresented* the condition of the dam, by silence or otherwise," *id.* at 1370 (emphasis added).

Similarly, in *Case, Inc. v. United States*, the Court of Appeals analyzed whether the plaintiff's two CDA actions in the Court of Federal Claims raised the same claims. 88 F.3d 1004, 1009–10 (Fed. Cir. 1996).  The plaintiff in *Case* had contracted with the Government to manufacture men's coveralls; however, due to a disagreement regarding quality standards, Case was unable to meet the delivery schedule agreed to by the parties.  *Id.* at 1005.  After repeated revisions to the schedule, the contracting agency terminated the contract, requiring Case to pay damages for default.  *Id.* at 1006.  Case's first claim argued that the agency's termination decision was improper because the modified delivery schedule was unreasonable.  *Id.*  The second claim alleged that the delays at issue were the result of overly strict government quality-inspections and defects in the coverall specifications.  *Id.* at 1006–07.  The Court of Appeals found that Case's claims were distinct—not "mirror images"—even though the claims "arose out of the same underlying set of facts and involved allegations of defective specifications."  *Id.* at 1010. Specifically, the plaintiff's first case challenged the agency's demand for the return of unliquidated progress payments and default termination due to an unreasonable delivery schedule, while the second case "asserted a claim for additional compensation—over and above the progress payments [plaintiff] had received" based on allegedly unreasonable government inspections.  *Id.*  Because the first claim asserted a right to money previously paid and the second asserted a right to equitable adjustment/lost profits, the claims requested different remedies and were thus different claims.  *Id.*

On the other hand, in *Scott Timber*, the Court of Appeals found sufficient similarities between claims raised by the plaintiff before the CO and later the Court of Federal Claims, despite modified legal theories.  333 F.3d at 1365–66.  In that case, the plaintiff had six timber contracts with United States Forest Service, which the agency suspended due to a federally protected bird species identified in the forest area.  *Id.* at 1362.  In its certified claim to the CO, the plaintiff

sought damages for unlawful suspension equal to the cost of obtaining replacement timber in the open market. *Id.* When later challenging the CO's determination, the plaintiff additionally alleged a contractual warranty claim, objected to the Forest Service's preparation and administration of contracts, and sought reimbursement of costs under the terms of the contracts. *Id.* at 1365. The Court of Appeals held that these were not new claims and thus were properly before the trial court. *Id.* at 1364–65. Though the contract warranty and reimbursement claims were brought for the first time before the Court of Federal Claims, the Court of Appeals found that the plaintiff "sought from the CO the same remedy sought from the trial court, namely consequential damages for the alleged breach," notwithstanding that it posed "slightly different legal theories" of recovery. *Id.* at 1366. Further, it found that the breach of contract claim in both instances was based on the same operative facts involving contract suspensions due to the endangered species protections. *See id.* at 1365.

Unlike the cases above, the Government does not allege that Monterey is raising a new claim in this action that it failed to present first to the CO. Instead, it argues that the same claim at issue here was presented to the CO in 2019; and because suit was not filed within 12 months of the 2019 decision, the claim is untimely. ECF No. 11 at 17. Although the Government raises the argument in a somewhat unique, inverted posture, the same analysis applies. *See Wood & Co. v. Dept. of Treasury*, 94-1 BCA ¶ 26445, 1993 WL 409984 (Oct. 8, 1993) ("In deciding whether two allegedly separate claims are merely various aspects of a single claim, involving a common set of operative facts, or are in fact separate claims, this Board follows [the same-operative-fact] rule established by the Court of Federal Claims.") (internal quotations omitted). Indeed, another way of analyzing the Government's argument is to ask whether Monterey would have been barred from asserting the claims it raises in its Complaint if they had been brought in a suit filed after the CO's

2019 decision—rather than his 2020 decision.  Either way one approaches it, the Government has not shown Monterey's 2019 and 2020 certified claims are the same.

1.    Claim Regarding the CE Unit Price

The Government argues that the first three counts of Monterey's Complaint (superior knowledge, defective specification, and misrepresentation) "were part of Monterey's first certified claim."  ECF No. 11 at 17.  It argues that Monterey's earlier claim alleged that the monthly workload estimates were inaccurate, faulted the VA for failing to base its estimates on historical data, and misrepresented its needs by overstating the contract requirements.  *Id.* at 19.  The Government asserts that the same operative facts about the CE ratio underlies both the 2019 and 2020 certified claims, even though the latter focuses on pricing.  ECF No. 15 at 10.  Additionally, the Government argues that the two claims seek the same type of damages—namely, "compensation for labor costs Monterey believed it had incurred because of the VA's erroneous and inaccurate case equivalents ratio."  *Id.* at 15.  In response, Monterey contends that the Complaint's first three counts were not a part of its first certified claim because that claim was based on the quantity of CEs generated while the second certified claim took issue with the CE unit price.  ECF No. 13 at 21.  Further, Monterey alleges that the operative facts underlying the later claim were not known to it until after the CO adjudicated its first claim.  *Id.* at 23.

a.    *The 2019 and 2020 Certified Claims are Based on Different Operative Facts.*

The Government is correct that, to some extent, the factual and legal focus of both Monterey's 2019 and 2020 certified claims was "whether the [CE] ratio was accurately calculated."  ECF No. 15 at 10.  But the similarities effectively end there.  *See Simulation Tech.*, 103 Fed. Cl. at 110.  First, the particular inaccuracy at issue and the effect it had on Monterey's losses under the contract are sufficiently distinct.  *See K-Con Bldg. Sys.*, 778 F.3d at 1006.  As

Monterey explains, the 2019 claim alleged that the "under-delivery of Case Equivalent workload" resulted in "contract payments that were insufficient to cover to the costs Monterey had incurred [to date] in performing" under the contract.  ECF No. 13 at 22.  In other words, the *quantity* of monthly Case Equivalents actually received by Monterey was inconsistent with the ratio the VA stated in the solicitation.  *Id*.  The 2020 claim, however, alleged that the VA's inaccurately calculated CE ratio, a figure that Monterey was required to use in setting its price, led to an undervalued Case Equivalent *unit price*.  *Id.*; *see* ECF No. 1 ¶ 57.  The former claim was premised largely on Monterey's own experience in achieving Case Equivalents in the first several months of application processing, while the latter relied on the historical data gathered by the VA (reflecting the experience of contractors performing the same contract) and first produced to Monterey with the CO's 2019 decision.  ECF No. 13 at 23–24; *see* ECF No. 1 ¶ 47.

Moreover, the legal theories asserted in the 2019 and 2020 certified claims also are distinct. *See Lee's Ford Dock*, 856 F.3d at 1370.  Monterey's 2019 claim alleged that the VA's "misrepresentation of the monthly workload and case equivalents" was due to the agency's "lack of diligence" in preparing the CE ratio.  ECF No. 11-1 at 190; *see* ECF No. 1 ¶ 47.  On the other hand, the 2020 claim contended that the VA established a defective CE ratio, despite possessing data showing that contractors were achieving a lower CE ratio, and withheld that material information from Monterey during the solicitation process.  ECF No. 11-1 at 292–94; *see* ECF No. 1 ¶ 57.  In sum, the 2019 claim alleged that the VA had been negligent; the 2020 claim alleged for the first time that the VA had actual knowledge that it failed to disclose.  *Compare* ECF No. 11-1 at 190, *with id.* at 287; *see* ECF No. 13 at 25; ECF No. 15 at 8 (characterizing the 2019 claim as alleging negligence).

Importantly, a claim alleging that the VA negligently estimated the workload under the contract requires different elements of proof than claims based on superior knowledge, defective specifications, and misrepresentation.[2] *See* ECF No. 13 at 31 (citing cases discussing elements of each claim). In reviewing Monterey's 2019 certified claim and the CO's 2019 decision, the Court finds neither addresses all the legal elements of Monterey's 2020 claim. Although the CO's 2019 decision did offer historical data that the VA used to develop the CE ratio, it did so only in an attempt to show that the VA had not negligently prepared the estimates. *See* ECF No. 11-1 at 266. In fact, Monterey argues that it was unaware of the historical data—on which its 2020 claim is based—until *after* the CO issued its final decision on the 2019 claim. ECF No. 1 ¶ 52. Accordingly, the 2019 claim does not (and could not) address Monterey's specific arguments in the 2020 claim challenging the VA's use of the underlying data itself, *see* ECF No. 11-1 at 289–91, or the VA's failure to disclose the data to Monterey during the solicitation process. *See M.A. DeAtley Constr.*, 75 Fed. Cl. at 579 (stating that operative facts are those which give rise to the particular cause of action).

Just as the Court of Appeals found sufficiently distinct operative facts supported separate claims for mutual mistake and knowing misrepresentation in *Lee's Ford Dock*, Monterey's 2019 and 2020 certified claims rely on distinct operative facts. That some facts between the claims are overlapping does not alter this conclusion.

---

[2] For example, a negligent estimate claim requires a showing that "the government's estimates were inadequately or negligently prepared, not in good faith, or grossly or unreasonably inadequate at the time the estimate was made." *Agility Def. & Gov't Servs., Inc. v. United States*, 847 F.3d 1345, 1350 (Fed. Cir. 2017) (internal quotations omitted). A superior knowledge claim requires, among other elements, that a contractor show the Government "was aware the contractor had no knowledge of and had no reason to obtain [vital knowledge of a fact that affected contract performance costs or direction]" and "failed to provide the relevant information." *Northrop Grumman Corp., Mil. Aircraft Div. v. United States*, 63 Fed. Cl. 12, 15–16 (2004) (quoting *GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991)).

b. *The 2019 and 2020 Certified Claims Seek Different Remedies.*

In addition to differing operative facts, Monterey's 2019 and 2020 certified claims also seek different remedies: cost reimbursement in 2019 versus an adjustment of the CE unit price in 2020. Although the Government focuses on the fact that both remedies would result in the payment of money to Monterey to compensate for unrecovered labor costs, it ignores the scope and underlying bases of the two remedies. *See* ECF No. 15 at 15.

As Monterey notes, the 2019 claim sought to recoup only specific costs it incurred performing the contract from October 2018 through February 2019. ECF No. 13 at 32; *see* ECF No. 1 ¶ 47. In particular, it requested approximately $1.5 million as an "equitable adjustment" due to the amount of money it had allegedly lost during that period.[3] ECF No. 11-1 at 199, *see id.* at 200. In 2020, however, Monterey sought a price adjustment derived by recalculating the CE unit price to reflect the actual CE realization rate based on the historical data produced by the VA. *Id.* at 307; *see* ECF No. 1 ¶ 99. Monterey argues that this remedy—based on its "trued-up" CE ratio— "is materially different from the . . . reimbursement of an itemized set of specific incurred costs" that it requested in 2019. ECF No. 13 at 33. The Court agrees. Unlike the 2019 claim, the requested remedy in 2020 (a) modifies an essential term of the agreement (*i.e.*, pricing), (b) applies to the entirety of the contract period, not simply a retrospective period, and (c) is premised on a

---

[3] Additionally, Monterey's 2019 claim suggested the Government either: modify the contract and convert it to a fixed-price labor model; or "adjust any/all multipliers to ensure they are consistent with the level of effort and the number of hours expected to complete the many varieties of cases and their individual complexities;" or "terminate the contract for convenience and recompete the requirement using valid/accurate CE processing data." ECF No. 11-1 at 199.

different basis for determining damages (*i.e.*, an adjustment to the CE unit price versus reimbursement of actual incurred costs).[4]  *See id.* at 34–35.

These differences do not, as the Government argues, reflect a mere adjustment of damages due to developments in litigation, which would not give rise to a new claim.  *See Tecom, Inc. v. United States*, 732 F.2d 935, 937–38 (Fed. Cir. 1984); *see also Wood*, 94-1 BCA ¶ 26445, 1993 WL 409984 (requested remedies differed only in that the latter claim requested a larger amount of money as more time had elapsed).  Nor are the remedies sought in the claims "essentially" the same as the Government suggests.  ECF No. 15 at 7; *see Scott Timber*, 333 F.3d at 1366.  They utilize distinct damages calculations more akin to the claims asserted in *Case* and *K-Con.  See Case*, 88 F.3d at 1010; *K-Con Bldg. Sys.*, 778 F.3d at 1007.  Although both of Monterey's claims arise generally from the alleged inaccuracy of the CE ratio, the 2019 claim sought only to recoup actual labor costs during a specified time period; meanwhile, the 2020 claim sought the amount of compensation Monterey would have received during the life of the contract if the CE unit price had been accurately calculated based on the realized CE ratio.  *See* ECF No. 13 at 32.  These remedies are not based on the same calculation as was the case in *Scott Timber.  See* 333 F.3d at 1366 (finding remedies were not distinct where both claims sought consequential damages equal to the cost of obtaining replacement timber on the open market).

Because Monterey's 2019 and 2020 certified claims relied on different operative facts and requested different remedies, the 2019 claim did not provide the CO "adequate notice of the basis"

---

[4] To put it colloquially, in 2019, Monterey alleged that there were not enough apples in the proverbial tree for it to pick (contrary to the Government's negligent estimate), and it sought to recover the cost of all the laborers it had amassed for the work during a single season.  In 2020, Monterey alleged that each individual apple it was required to pick was inadequately priced (based on the Government's knowingly inaccurate estimate), and as a remedy it proposed a new, accurate pricing unit for each apple to adequately compensate it for the life of the contract.

of Monterey's 2020 claim.  *Id.*  Monterey's action in this Court premised on the 2020 claim is therefore timely.

2.     Claim Regarding Constructive Change

The Government also contends that Monterey's 2020 certified claim alleging a constructive change due to revisions of the Work Instructions was previously brought in the 2019 claim challenging changes to the CTF.  ECF No. 11 at 22.  According to the Government, "[d]espite having some additional details and different language, the two claims are 'substantially identical.'" *Id.*; *see id.* at 22–23 (citing *Woodruff v. United States*, 122 Fed. Cl. 761, 778 (2015)).  In response, Monterey argues that its first certified claim took issue with the CTF rather than the Work Instructions and that the Government elides the distinctions between these two different documents.  ECF No. 13 at 36.  Further, Monterey asserts that it specifically chose not to monetize the earlier claim relating to the CTF changes, meaning that there was no sum certain on which a CDA claim could have been based in 2019.  *Id.* at 37.

The Government's reliance on *Woodruff* is not persuasive.  In that case, the court held that the plaintiff impermissibly brought two "substantially identical" breach of contract claims before both the Civilian Board of Contract Appeals ("CBCA") and then the Court of Federal Claims. *Woodruff*, 122 Fed. Cl. at 778.  As the court explained, "[s]eparate lawsuits can only be maintained at the appropriate [board] and the Court of Federal Claims . . . [if] the suits are based on different claims." *Id.*  In his complaint, the *Woodruff* plaintiff "explicitly stated in the first cause of action that [he sought] review of the CBCA's adverse decision." *Id.*  The two claims could not have been more alike as the latter sought review of the former.  As such, the court dismissed the plaintiff's complaint. *Id.*

22

Here, Monterey's 2019 claim alleged that the VA's changes *to the CTF* created additional work for Monterey under the contract.  ECF No. 11-1 at 190.  Although Monterey informed the VA that it also had received five different versions of the Work Instructions, it clarified that,"[f]or the purposes of this claim, we have not determined the impact of those changes."  *Id.* at 194.  Instead, it analyzed only the CTF, which it identified, in part, as the "operationalization" of the Work Instructions and highlighted a number of changes that Monterey believed warranted contract modification.  *See id.* at 195–97.  Monterey specifically stated that it did not "monetize" this portion of its claim, *id.* at 190, and it recommended that the Government complete a more comprehensive examination of the CTF to determine the full extent of the changes, as well as modifying the contract to update invoicing methods and adjust the multipliers to reflect the work Monterey was doing, *id.* at 197.

 By contrast, Monterey asserted in its 2020 claim that changes *to the Work Instructions* constituted a constructive change, resulting in a substantial amount of additional processing time to achieve a CE.  *Id.* at 311; *see* ECF No. 1 ¶ 70.  According to Monterey, the revisions went beyond "minor" changes allowed by the contract and caused unanticipated labor costs that were not accounted for in arriving at Monterey's CE unit price.  ECF No. 11-1 at 308.  The 2020 claim was monetized and sought $952,280.15 in additional labor costs.  *Id.* at 312; ECF No. 1 ¶ 70.

Though he disagreed that all the identified changes were more than "minor," and thus that Monterey was entitled to the total amount of damages it requested, the CO agreed that the 2020 Work Instructions claim was distinct from the 2019 CTF claim.  ECF No. 11-1 at 326.  Specifically, he explained that, although Monterey raised "concerns" with the Work Instructions in its 2019 claim, "that claim included no sum certain request for compensation related to the [Work Instruction] changes or any proposed increase to the CE rate."  *Id.*

For the same reasons, the Court also concludes that Monterey's constructive change claim was not previously brought in its 2019 certified claim. Apart from noting that the CTF is referenced throughout the Work Instructions, the Government has not shown that the 2019 and 2020 claims alleging changes to these two separate documents were substantially identical.[5] *See* ECF No. 11 at 11.

Even if the claims have some overlapping operative facts, they also are distinct because they request different remedies. In 2019, Monterey requested contract modification as a result of the changes made to the CTF; it asserted a sum certain monetary claim in 2020 resulting from the changes made to the Work Instructions. ECF 11-1 at 190, 312. The Government contends that it would be "simply a matter of arithmetic" to determine a monetary sum based on Monterey's 2019 claim regarding CTF changes, ECF No. 15 at 18, but the claim did not assert facts that through "simple mathematical calculation" rise to the level of stating a sum certain. *Modeer v. United States*, 68 Fed. Cl. 131, 137 (2005) (involving a claim for monthly rental payments from a holdover tenant at a pro-rata rate of a specified annual amount, where all that was unknown at the time was the number of months in question) (citing *CPS Mech. Contractors, Inc. v. United States*, 59 Fed. Cl. 760, 764 (2004)), *aff'd*, 183 F. App'x 975 (Fed. Cir. 2006). The CO's 2020 decision acknowledged as much. ECF No. 11-1 at 326 (stating lack of sum certain or proposed increase in CE ratio "made it challenging to understand the full scope of Monterey's alleged losses" based on the 2019 certified claim).

---

[5] At oral argument, the parties could not precisely articulate the relationship between the CTF and the Work Instructions. However, the Court generally understands that the Work Instructions dictated how Monterey was to perform the verification process and the CTF instructed it how to document the verification activities, meaning that changes to the Work Instructions could encompass a broader range of issues than changes to the CTF alone.

Accordingly, the 2019 claim did not give the CO "adequate notice of the basis" for Monterey's 2020 constructive change claim. *Scott Timer*, 333 F.3d at 1366. Monterey's action in this Court premised on the 2020 claim is therefore timely.

**B.     Monterey Adequately Pled a Constructive Change.**

Even assuming this action is timely, the Government contends that Monterey failed to state a claim on which relief may be granted regarding the changes to the Work Instructions because Monterey failed to plead facts that meet the elements of a constructive change. ECF No. 11 at 23. As the Court of Appeals has held, such claim requires a plaintiff to show "(1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government." *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014) (citing *The Redland Co. v. United States*, 97 Fed. Cl. 736, 755–56 (2011)). The Government argues that Monterey cannot establish either element because the changes made to the Work Instructions were within the scope of the contract and because Monterey failed to allege that it performed the additional work at the Government's direction. ECF No. 11 at 25.

1.      <u>Monterey Sufficiently Alleges that the Changes to the Work Instructions Went Beyond the Scope of the Contract.</u>

As to the first element, the Government argues that the contract "always contemplated that the contractor would receive updated Work Instructions with 'minor process updates/changes.'" *Id.* at 23 (quoting ECF No. 11-1 at 16). It contends that the allegations in the Complaint "merely state that the work instructions 'added more than 30 requirements,' Compl. ¶ 67, and that they therefore 'constituted a constructive change that materially impacted' Monterey's performance, *id*. ¶ 68." ECF No. 15 at 18. As such, Monterey purportedly "fails to allege that it was required to perform any work *beyond* the scope of the contract." ECF No. 11 at 24 (emphasis in original).

A review of Monterey's Complaint shows otherwise.  Monterey does not refute that the contract contemplated the VA making "minor updates and changes" to the Work Instructions during performance.  ECF No. 13 at 40–41; *see* ECF No. 1 ¶ 65 (citing the contract language).  It contends that the changes made to the Work Instructions constituted a compensable constructive change.  ECF No. 13 at 41 (citing ECF No. 1 ¶¶ 67–68).  To support that allegation, Monterey alleged that the revised Work Instructions "changed or added more than 30 requirements that Monterey had to follow when processing applications," ECF No. 1 ¶ 67, which "materially impacted the manner in which [its] staff were required to process cases," *id.* ¶ 68.  It further alleged that "the numerous changes to the Work Instructions after the Contract was issued to Monterey . . . require[ed] Monterey to perform significant additional work beyond the work anticipated when it proposed its price for the Contract."  *Id.* ¶ 73 (describing 2020 claim); *see id.* ¶ 110 (alleging that the changes to the Work Instructions "increased the amount of time necessary to process cases beyond what Monterey had calculated based on the processes set forth in" the instructions included in the solicitation).  Monterey also alleged that the changes "were not 'minor' process changes, and collectively required Monterey to devote a net additional 484 minutes to achieve a Case Equivalent."  *Id.* ¶ 73.

In light of the pleading standard, Monterey's Complaint sufficiently alleges that the changes to the Work Instructions went beyond the scope of the contract.

2.   <u>Monterey Sufficiently Alleged that the Work Performed as a Result of the Revisions to the Work Instructions Was Ordered by the VA.</u>

On the second element, the Government argues that Monterey failed to identify anyone with authority to bind the Government who ordered it to perform additional work required by the revised Work Instructions or any direction that it received from the VA.  ECF No. 11 at 25. According to the Government, Monterey alleges only that the contract required it "to process

verification applications cases in accordance with VA-issued Work Instructions." *Id.* (quoting ECF No. 1 ¶ 109). The Complaint, however, alleges that "VA officials with the authority to direct Monterey's performance . . . directed Monterey to process cases in accordance with [the updated] Work Instructions." ECF No. 1 ¶ 111; *see id.* ¶ 66 ("the VA . . . required Monterey to comply with the revised Work Instructions once they were issued"). It also alleged that the CO "was contemporaneously aware" of that direction and "approved or ratified" it. *Id.* Indeed, the CO's 2020 decision "determined that the [Work Instruction] changes were all made at Government direction by those with implied authority." ECF No. 11-1 at 326.

At this early stage in the proceedings, Monterey's allegations are sufficient to state a constructive change claim, notwithstanding that it does not specifically identify the person who ordered it to comply with the Work Instruction changes.

## IV.  CONCLUSION

For these reasons, the Government's Motion (ECF No. 11) is **DENIED**. The Government shall file its Answer to Plaintiff's Complaint by no later than May 13, 2022.

**SO ORDERED.**


Dated: April 29, 2022                              */s/ Kathryn C. Davis*
_____
                                                   KATHRYN C. DAVIS
                                                   Judge